IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
United States of America,      ) Criminal Action
                               ) No. 17-CR-053
                 Plaintiff,    )
                               ) SENTENCING
vs.                            )
                               ) Washington, DC
Adam Harris Victor,            ) March 6, 2018
                               ) Time:  2:30 p.m.
                 Defendant.    )
```
_____

TRANSCRIPT OF SENTENCING
HELD BEFORE
THE HONORABLE JUDGE KETANJI B. JACKSON
UNITED STATES DISTRICT JUDGE

_____

A P P E A R A N C E S

```
For the Plaintiff:      Andrew Wallace Laing
                        U.S. DEPARTMENT OF JUSTICE
                        Public Integrity Section
                        1400 New York Avenue NW
                        Washington, DC 20005
                        (202) 353-8433
                        Email:  Andrew.laing@usdoj.gov

For the Defendant:      Samuel Rosenthal
                        NELSON MULLINS RILEY & SCARBOROUGH LLP
                        101 Constitution Avenue, NW
                        Washington, DC 20001
                        202-689-2915
                        Email:  Sam.rosenthal@nelsonmullins.com

Probation Officer:      Kathie McGill
```
_____

```
Court Reporter:         Janice E. Dickman, RMR, CRR
                        Official Court Reporter
                        United States Courthouse, Room 6523
                        333 Constitution Avenue, NW
                        Washington, DC  20001
                        202-354-3267
```

1          THE COURTROOM DEPUTY:  Your Honor, this is criminal

2     case number 17-053, United States of America versus Adam Harris

3     Victor.

4          Kathie McGill is here with the probation office.

5          Would counsel please approach the lectern and state

6     your appearances for the record.

7          MR. LAING:  Andrew Laing for the United States.  Good

8     afternoon, Your Honor.

9          THE COURT:  Mr. Laing.

10         MR. ROSENTHAL:  Good afternoon.  Sam Rosenthal, and

11    my partner Mike Ruggio, for the defendant Mr. Victor.

12         THE COURT:  Good afternoon.  I see that Mr. Victor is

13    here as well.

14         We are here for the sentencing of Mr. Adam Victor,

15    who has pled guilty to political contributions in names of

16    others; is that correct?

17         MR. LAING:  Yes, Your Honor.

18         MR. ROSENTHAL:  Yes, Your Honor.

19         THE COURT:  That crime of conviction is a violation

20    of Title 52 § 30122 and 30109(d)(1)(D)(i) of the United States

21    Code.  The Court has received and reviewed the presentence

22    report and the sentencing recommendation from the probation

23    department, and also the sentencing memoranda from the

24    government and from the defendant, including various exhibits.

25    It appears that the parties have engaged in the process of

1    reviewing and revising the presentence report and, also, that

2    the final report is complete.

3         Mr. Victor, let me address you.  Today's sentencing

4    hearing will essentially proceed in four steps.  The first step

5    of today's hearing is for me to determine whether you have

6    reviewed the presentence report and whether there are any

7    outstanding objections to the PSR and, if so, to resolve those

8    objections.

9         The second step is to determine what sentencing

10   guidelines and sentencing range applies to your case.  And I do

11   this based on an evaluation of a defendant's criminal history

12   and a consideration of the factors that are set forth in the

13   guidelines for the particular offense, and also any mitigating

14   or aggravating factors that may warrant a departure under the

15   Sentencing Guidelines Manual.

16        The third step, after we've gotten to the point of

17   addressing what the guidelines provide, is to hear from the

18   government, from your counsel, and from you, if you wish to be

19   heard, about the sentence that the Court will impose in this

20   case.

21        And then the last step requires the Court to fashion

22   a just and fair sentence, in light of the factors set forth by

23   Congress in a statute 18 U.S.C. 3553(a).  As part of this last

24   step the Court will actually impose the sentence, along with

25   any required consequences of the offense.

1          Now, I often go through the process of explaining the

2    procedure, in part because I realize that it is sometimes hard

3    for non-lawyers to follow some of the more mechanical things we

4    have to do as part of the sentencing.  But, I also, in

5    addressing the defendant, make sure to say that it is important

6    for you to keep in mind why we're here at this moment, even as

7    we go through some steps that you may not understand.  And it's

8    important for you to understand the gravity of the situation.

9          You have committed and pled guilty to conduct that

10   constitutes a federal crime.  And so today's proceeding is a

11   serious matter because it is fundamentally about the

12   consequences that you will have to face as a result of your

13   decision to engage in criminal behavior in violation of federal

14   law.

15         All right, you may have a seat.

16         Let me start with the first step, which is an

17   analysis of the presentence report.  The presentence report and

18   sentencing recommendation were filed in this matter, the

19   revised version, on February 26, 2018.  We start by asking Mr.

20   Laing if the government has any objection to any of the factual

21   determinations that were set forward in the presentence report?

22         MR. LAING:  None from the government, Your Honor.

23         THE COURT:  Let me start by asking Mr. Victor -- you

24   may remain seated -- are you fully satisfied with your

25   attorneys in this case?

1          THE DEFENDANT:  Yes, I am, Your Honor.

2          THE COURT:  And do you feel that you've had enough

3    time to talk to them about the probation department's

4    presentencing report and the papers filed by the government in

5    connection with this sentence?

6          THE DEFENDANT:  Yes, I did, Your Honor.

7          THE COURT:  All right.  So then let me ask Mr.

8    Rosenthal, will you be speaking primarily in your client's

9    favor here today?

10          MR. ROSENTHAL:  Yes, Your Honor.

11          THE COURT:  Okay.  Have you and your client read and

12    discussed the presentence report?

13          MR. ROSENTHAL:  At length.

14          THE COURT:  And are there any disputed issues of

15    fact?  I understand that there were a number of places

16    throughout the report where you had some question about facts,

17    but are there any that you still think need to be resolved by

18    the Court at this time?

19          MR. ROSENTHAL:  No, Your Honor.

20          THE COURT:  All right.  So, hearing no objections, I

21    will accept the facts as recited in the presentence report.

22    These are the facts regarding the circumstances of the offense

23    and, therefore, the facts as stated in that report will be my

24    findings of fact for the purpose of sentencing.

25          Let me turn to the probation office's determination

1   of the applicable guideline range, which also appears in the

2   PSR.  The presentence report lays out the probation office's

3   calculation of the advisory guideline range that applies in

4   this case.  This calculation was done using the 2016 Guidelines

5   Manual and it is as follows:

6         Beginning with the guideline offense level, the

7   applicable guideline in this case is 2C1.8, which has an

8   offense level of 8 under the circumstances presented here.

9   According to the presentence report, the value of illegal

10  transactions that are referenced in the context of that

11  guideline is a specific offense characteristic that applies.

12  And based on the parties' stipulated statement of offense, four

13  levels are added because the value of the illegal transactions

14  was more than $15,000.

15        Let me just take a moment at this point to ask

16  government counsel about the references in the plea agreement

17  to other similar conduct of the defendant that is not part of

18  the stipulated statement of offense.  Let me ask you how, if at

19  all, you propose that the Court take that conduct into account?

20        MR. LAING:  It's the government's position that the

21  Court can and should take that into account with respect to the

22  3553(a) factors as it bears on the history and characteristics

23  of the defendant.  However, as the government agreed with the

24  defendant and as the probation office has adopted, we don't

25  believe that it constitutes relevant conduct for the purposes

1    of the guidelines calculation, and that was part of the plea

2    agreement that we submitted to the Court.

3              THE COURT:  All right.  So you'll be addressing it in

4    your discussion perhaps at the end related to the 3553(a)

5    factors.

6              MR. LAING:  I will, Your Honor.

7              THE COURT:  All right.  Thank you.  All right.  The

8    government has also represented that Mr. Victor has

9    demonstrated acceptance of responsibility in a manner that

10   entitles him to a two-level reduction under 3E1.1(a).

11   Therefore, prior to the consideration of any departures or

12   variances, Mr. Victor's total offense level is 10.  Is there

13   any objection to this calculation of offense level?

14             MR. LAING:  Not from the government, Your Honor.

15             MR. ROSENTHAL:  Not from the defense.

16             THE COURT:  All right.  Turning to the applicable

17   criminal history category, the presentence investigation has

18   found that Mr. Victor has no prior convictions and, therefore,

19   under the Guidelines Manual this puts Mr. Victor in criminal

20   history category I.  Are there any objections to the criminal

21   history calculation?

22             MR. LAING:  None from the government, Your Honor.

23             MR. ROSENTHAL:  None from the defense.

24             THE COURT:  Given a criminal history category of I

25   and an adjusted offense level of 10, the applicable sentencing

1    range in this case under the guidelines is 6 to 12 months of

2    imprisonment, which is in zone B of the guideline sentencing

3    table.  Are there any objections to this guideline range

4    calculation?

5              MR. LAING:  No, Your Honor.

6              MR. ROSENTHAL:  No, other than as it applies to the

7    alternative.

8              THE COURT:  Yes.  That's why I said it.

9              Having determined the applicable guideline range, the

10   next step is for the Court to consider departures.  The

11   presentence report does not include any departure grounds and

12   neither party has mentioned any, perhaps because of the terms

13   of your plea agreement.  But, at this point, before I go on to

14   a discussion of variances, I typically ask whether either side

15   would like to raise any departure grounds, and that is reasons

16   that are specifically stated in the Guidelines Manual as

17   grounds for departing from the applicable guideline range.

18             Mr. Laing?

19             MR. LAING:  None from the government, Your Honor.  I

20   would just ask the government to also place the statutory fine

21   range on the record as well initially, since it differs from

22   the guideline range.

23             THE COURT:  Yes.  We will be talking about that.  I'm

24   just about to go over the universe of potential penalties.

25             MR. LAING:  Thank you, Your Honor.

1          THE COURT:  But in terms of departures -- so, tell me

2     what you're meaning.  The statutory fine range differs from the

3     guideline fine range, yes, and we'll discuss; we will discuss.

4          MR. LAING:  Thank you, Your Honor.

5          THE COURT:  But in terms of a, sort of, straight

6     departure, as I understand it, the government has some

7     departure grounds.

8          Let me ask defense counsel.

9          MR. ROSENTHAL:  No, we're not asking for departure.

10          THE COURT:  All right.  Thank you.  Now I turn to the

11     section in which I talk about the applicable statutory and

12     guidelines penalties for this offense.  This is because section

13     3553(a), which I mentioned at the beginning, requires the Court

14     to consider a variety of factors, including the sentencing

15     guideline range as I just discussed.  And also, the applicable

16     penal statutes.

17          So the charge of political contributions in names of

18     others, in violation of Title 52 § 10 -- excuse me, 30122 and

19     30109(d)(1)(D)(i) of the United States Code carries a statutory

20     maximum penalty of two years of imprisonment.  Because of the

21     charges in this case, as stated in the indictment, no mandatory

22     minimum is applicable.  And, by statute, Mr. Victor is eligible

23     for probation for a period of not less than one year nor more

24     than five years.

25          If a term of imprisonment is imposed, the statutes

1    provide that Mr. Victor faces a supervised release range

2    following imprisonment of no more than one year, and under the

3    guidelines that range is also no more than one year.  And the

4    statute of conviction sets a minimum fine, which is the greater

5    of 300 percent of the amount involved in the violation, or

6    $50,000, which, in this case, I believe makes the effective

7    minimum fine amount $52,000.

8              I'll hear from the parties in a minute to determine

9    whether my understanding accords with yours.

10              The statute also sets a maximum fine of up to $1,000

11   of the amount involved with the violation -- excuse me, 1,000

12   percent of the amount involved in the violation, which is

13   $175,000 in this case.  And as government counsel mentioned,

14   the guideline fine range differs, it's between 2,000 and

15   20,000.  But, of course, I believe the statutory prescriptions

16   trump.

17              And, the statutory and guideline restitution

18   provisions are inapplicable in this case.

19              Let me ask counsel if I have stated accurately the

20   statutory and guideline framework under which we are operating?

21              MR. LAING:  I believe that's all accurate from the

22   government's perspective.  I do want to correct, I think it's

23   $52,500, not $52,000.

24              THE COURT:  Thank you very much.

25              MR. ROSENTHAL:  Your Honor, we think you have stated

1    it correctly.

2              THE COURT:  Do you agree with the 52,500?

3              MR. ROSENTHAL:  We do.

4              THE COURT:  All right.  Thank you.

5              Let's move now, before I go on to discuss the other

6    sentencing factors that will bear on the Court's final

7    decision, I'm going to give the parties an opportunity to

8    address the sentencing guideline calculation and the Court's

9    considerations under 3553(a).

10             Mr. Laing, you may come forward.

11             MR. LAING:  Thank you, Your Honor.  Conduit

12   contributions to candidates for federal office undermine the

13   transparency and integrity of the federal campaign finance

14   system.  I would like to focus particularly on three sentencing

15   factors under 3553(a) that the government believes support the

16   imposition of a sentence within the guideline range.  And those

17   factors are the seriousness of the offense, the defendant's

18   history and characteristics, and the importance of deterrence,

19   and the promotion of respect for the law.

20             As I said, the government is asking that the Court

21   impose a sentence within the guidelines range.  As Your Honor

22   noted, that's 6 to 12 months, although it is within zone B, so

23   alternatives are available.  And the government believes an

24   appropriate sentence would include a fine of $52,500 to

25   $175,000.  And we would point out, as well, there's been no

1    indication or allegation that the defendant is unable to pay.

2    He appears to be affluent, based on representations in the PSR.

3    So we believe a fine is appropriate.

4          As to the first factor, the seriousness of the

5    offense, conduit campaign contributions are serious offenses.

6    They circumvent the regulatory framework in two different ways:

7    First, by exceeding limits on individual's contributions to

8    particular campaigns for federal office during a calendar year.

9    And, second, by obscuring from the FEC, the government, and the

10   public at large the true source of contributions to those

11   campaigns from public disclosure.

12         In addition to that, conduit contributions, those

13   made in violation of this particular statute, are by definition

14   willful.  That is to say, they're made with knowing disregard

15   of the regulatory framework that makes them illegal.  Mr.

16   Victor made these contributions despite knowing that he wasn't

17   permitted to and that he was committing a crime.

18         Finally, under this sentencing factor, conduit

19   campaign contributions necessarily involve some measure of

20   concealment, false reporting to the FEC and, thus, to the

21   public, covers up the true sources of support for a given

22   candidate.  And these conduit contributions, in this particular

23   case, were further masked and reimbursement was made more

24   difficult to detect when the defendant reimbursed the conduits,

25   the people he was reimbursing, to pay through bank accounts

 1      controlled, ostensibly, by LLCs.

 2              The second factor is the defendant's personal history

 3      and characteristics.  As set forth in the plea agreement, to

 4      which the defendant agreed and admitted, he previously

 5      contributed an additional $27,400 in 2010 and $35,000 in 2011

 6      through immediate family members and colleagues to the campaign

 7      of a candidate for United States senator.

 8              THE COURT:  Let me just be -- I'm sorry to interrupt

 9      you, but in 2011, it was earlier in the same year as the

10      offense of conviction?

11              MR. LAING:  That's correct, Your Honor.

12              THE COURT:  All right.

13              MR. LAING:  And those earlier contributions

14      underscore the willfulness of the charged offense, as well as

15      the defendant's disregard for the integrity of the campaign

16      finance system.

17              The third 3553(a) factor that I would like to

18      emphasize is the importance of deterrence and promotion of

19      respect for the law.  Criminal conduit campaign contributions

20      are difficult to detect and difficult to prosecute, in part,

21      again, by definition, the true source of the campaign

22      contributions is necessarily obscured.  In addition to that,

23      reimbursement for the campaign contribution is often and easily

24      masked as a gift or a loan.  In the case of an employee it may

25      be dressed up as a salary, a bonus payment, a retirement

1    contribution, or a reimbursement for a supposedly legitimate

2    business expense.  So an appropriate sentence should take

3    deterring these difficult-to-detect crimes into account.

4          Finally, again, I would emphasize that criminal

5    conduct contributions such as this one are willful.  So with

6    these kinds of crimes it's particularly important to promote

7    respect for the law, where defendants who commit these crimes,

8    by definition, do so despite knowing what they're doing is

9    wrong.

10         For all of those reasons and for the reasons that we

11   articulated in our sentencing memo, the government has

12   requested a sentence within the guideline range, as well as a

13   fine within the statutory range.

14         Thank you, Your Honor.

15         THE COURT:  Thank you.

16         Mr. Rosenthal.

17         MR. ROSENTHAL:  I would like to address, Your Honor,

18   the three things that Mr. Laing has identified as seriousness

19   of the offense, characteristic of the defendant, and respect

20   for the law.

21         No one disputes this is a serious offense.  It's a

22   felony.  And he will carry that with him for the rest of his

23   life.  And so no one in this courtroom -- at least no one at

24   counsel table can possibly suggest the defendant does not

25   regard this as extremely serious.

1          Respect for the law.  He's pled guilty.  He has come

2    before the Court, he will speak to the Court directly.  And he

3    clearly has respect for the law.  He's lived his whole life

4    having respect for the law.  He has done things for his

5    neighbors, his community and beyond, exceptional things.  And

6    he does have a respect for the law.  And the fact that he

7    engaged in this conduct, I think we need to put it in

8    perspective.

9          This is not like so many cases we read in which there

10   was a convoluted or difficult scheme that was difficult to

11   detect.  And I want to correct one thing Mr. Laing said.  And

12   Your Honor had asked whether or not the earlier checks were in

13   the same year; they were not.  They were early 2011.  The

14   checks that make up the offense where in January 17, 2012.

15   There is one that was within a year, but the bulk of them were,

16   I think, 2011, and the offense ones were -- actually, in 2010.

17   I'm sorry.  I apologize.  And the ones that are -- make up the

18   offense are dated January 17, 2012.  And that makes --

19          THE COURT:  I'm sorry, before you leave that.  I may

20   be confused.

21          MR. ROSENTHAL:  I may be, Your Honor.

22          THE COURT:  So I want to make sure we're on the same

23   page.  I'm looking at the parties' plea agreement, on page 5,

24   in paragraphs A and B where -- and this is, I think, the only

25   place in the record that I really have some idea of what is

1    being discussed when you're talking about other conduit

2    contributions that have been made that were not discussed in

3    the statement of offense.  And the dates, as I see here, are

4    earlier in the year 2011.  More specifically, in March of 2011.

5    Is what you're referring to?

6              MR. ROSENTHAL:  Yes.  And I'm also referring to the

7    ones in 2010.  And I think the bulk of them, as I understand

8    it, were actually in 2010.  If we look at page 5, they indicate

9    the ones that were in March of 2011, there was one $5,000 check

10   that was broken up by the committee.  There was one March 30th,

11   2011.  But then if you look at page 6, the other checks were

12   all in 2010, and that's what I was referring to, Your Honor.

13             THE COURT:  All right.  Just to clarify the record,

14   it's suggesting three colleagues transmitting one $5,000 check

15   each in March of 2011, for a total of $15,000.  Or at least

16   that's what it says.

17             MR. ROSENTHAL:  That is correct.

18             THE COURT:  And then other checks later on for a

19   total of $20,000.

20             MR. ROSENTHAL:  Correct.

21             THE COURT:  All right.

22             MR. ROSENTHAL:  And the reason I -- I want to dwell

23   on that is because the cases indicate that when we look at

24   conduct -- and this is the point that Your Honor raised,

25   related conduct -- there's a presumption that conduct more than

1    a year old is not related.  And I think it's --

2            THE COURT:  It's not more than a year old if it's in

3    March of 2011 and this conduct is in November and December of

4    2011.

5            MR. ROSENTHAL:  Mr. Laing is also including conduct

6    in 2010, and that's more than a year old.

7            THE COURT:  Okay.

8            MR. ROSENTHAL:  The point, Your Honor, is let's look

9    at the conduct.  What happened in the earlier contributions --

10   that is, as Mr. Laing correctly points out, we wholeheartedly

11   agree with him, was not related conduct -- was he was asked to

12   hold a dinner.  And he held a dinner for a senatorial candidate

13   and he invited people to that dinner and made contributions in

14   their names.

15           In 2012, what went on was a different campaign.  It

16   was for Herman Cain, who was running for president.  He wasn't

17   running for the senate.  And so he was asked, Do you want to

18   invite anyone to a dinner, not that you're hosting?  And he

19   said yes and he made contributions that were for that campaign.

20   Different campaigns, different contributions, different time

21   periods.  And so --

22           THE COURT:  Are you saying that shouldn't be taken

23   into account?  I think we've already crossed the relevant

24   conduct bridge.

25           MR. ROSENTHAL:  We have.

1          THE COURT:  Because relevant conduct is a term of art

2     that is pertaining to the guideline calculation.  And so to the

3     extent the government has agreed that these other things you're

4     talking about don't count for relevant conduct guideline

5     purposes, fine.

6          MR. ROSENTHAL:  Okay.

7          THE COURT:  But he's still saying they should not be

8     ignored, they're in the realm of consideration when one thinks

9     about what the appropriate sentence is.  And why is that not

10    so?

11         MR. ROSENTHAL:  And, Your Honor, I'm glad that you

12    did enlighten me.  I thought we were still talking about

13    relevant conduct.  I'm very glad to hear that we're past that.

14         So let's talk about $17,500 and talk about the other

15    conduct that the government has raised.  If we look at 17,500,

16    or if we add in the other cases and try to determine what's a

17    sentence within the heartland, what would be an appropriate

18    sentence?  I have not found a single case where someone has

19    been sentenced to incarceration for that amount, even if we

20    were to take the previous conduct and say we're going to count

21    that whole-hog in the amount.

22         THE COURT:  So how much is it with the previous

23    conduct?  Whole hog with that amount is what? 65 or something?

24         MR. ROSENTHAL:  I think that's around it.

25         THE COURT:  You're saying you haven't found a case in

1    which someone with that amount of conduit contributions has

2    received incarceration?

3              MR. ROSENTHAL:  No, Your Honor, with these facts.

4    There are lots of cases where, for example -- we cited a number

5    of them in our brief, and the government hadn't disputed

6    them -- where someone, for example, was the treasurer of a

7    campaign.  And I think -- let me just grab my notes.

8              And if we look at these cases and the amounts, some

9    of them are really quite staggering.  For example, we cited a

10   case from the Eastern District of Wisconsin, it was $250,000 in

11   contributions, sentence of probation.  In this District there's

12   actually a number of cases which I think are quite relevant and

13   bear on the Court's decision how to treat the defendant.

14             *Stipe*, 250,000 in illegal contributions, pled guilty

15   to a five-year conspiracy; not like the defendant here today.

16   But he also obstructed justice, created false documents, and

17   committed perjury; five years probation, six months of home

18   confinement, 1,000 hours of community service.

19             *Crop Growers*, another case in this district, 46,000

20   in contributions.  But, also, there was an FCPA conspiracy to

21   file falsified documents.  And that also was a sentence of

22   probation.

23             I did find one, and I would like to use it as an

24   illustration, where somebody was sentenced to incarceration.

25   That was *U.S. versus Thompson*, in this District in 2014.  The

1     amount of contributions was $3.3 million.  It related to 28

2     candidates.  The individual pled to two five-year conspiracies

3     and there was a finding that the contributions were directly

4     related to the defendant's business interest.  That is, he had

5     a motive for doing it.  And that was a three-month sentence.

6          This is an interesting case in that it wasn't one

7     where there were any efforts on the part of the defendant to

8     engage in an elaborate scheme.  There was no FCPA violation.

9     He issued successive checks.  In one case he issued one check

10    that was then split up.  Well, if it's one check, on one bank

11    account, it certainly wasn't an attempt to hide it.

12         But, nevertheless -- and we don't want to minimize at

13    all that he committed a crime and we stand by that and he

14    accepts responsibility -- but to say that this was anything

15    other than a plain vanilla contribution in the name of another

16    I think overstates the case.  It was one in which he is charged

17    not with lying, not with making a false statement, but with

18    failing to say that the contribution was being forwarded in the

19    name of another, or in the case of one -- a bank account that

20    he controlled issued the checks.

21         And, so, is he guilty?  Yes.  Is he pleading guilty?

22    Yes.  But it's one in which if we look at his conduct and we

23    put it next to others in which there has been probation or I

24    think in one case home confinement, it's one in which there is

25    clearly no sort of elaborate crime, an amount that -- I use the

1    word "modest."  It's not modest, it's a substantial amount, but

2    it is less, it is far less than in other cases that we see

3    where the courts have ordered probation, including in this

4    District.

5            If we look at the factors that the Court is properly

6    considering, what type of person he is, I'd really like to

7    wait, I would like Your Honor to hear from some of the people

8    who are here in court today.  His family is sitting on the

9    right side there and I would like to --

10           THE COURT:  Have them come forward?

11           MR. ROSENTHAL:  -- have them come forward and speak.

12           THE COURT:  That's fine.

13           MR. ROSENTHAL:  I don't know when you want to do it,

14   if you want to do it now?

15           THE COURT:  That's fine.  Whenever you would like to

16   do it in the course of your presentation.  You may structure it

17   how ever you wish.

18           MR. ROSENTHAL:  Your Honor -- and I know we have

19   submitted a number of letters -- I wonder if Mr. Laing and I

20   could approach sidebar for a moment?

21           (Bench discussion:)

22           THE COURT:  All right.  I have technical difficulties

23   in my courtroom in terms of the equipment, so I'm going to hand

24   each of you this microphone so that you can be heard, but not

25   out in the gallery.  All right.

1          MR. ROSENTHAL:  Your Honor, we understand that

2     yesterday afternoon at -- I got them at 4:39, there were a

3     series of letters that were sent to Your Honor.  We don't know

4     whether you've seen them or considered them.  I know you

5     haven't mentioned them.  We think it would be highly improper

6     for them to influence the Court in any way.

7          I literally received them at 4:39.  It's almost like

8     walking into a trial and being handed a superseding indictment.

9     Your Honor, there are all sorts of allegations there.  And let

10    me just say, the individual, the attorney was as an attorney

11    who was suspended in New York for five years.

12         THE COURT:  Let me cut you off because it was the

13    Court's position that unless they were being presented to the

14    Court by the government as victim impact statements, they were

15    not to be considered.  So, I have not read them.  I know of

16    them, given that they were e-mailed to my office.  But we

17    indicated to the defense counsel that -- or, to that counsel

18    that he needed to communicate with the government in order to

19    have them have any bearing at all on this proceeding.

20         MR. ROSENTHAL:  We appreciate that.  The only thing

21    is that we would ask they not be part of the record and they be

22    stricken.

23         THE COURT:  They're not part of the record.  The

24    Court has not filed them or done anything with them.  I'm

25    assuming -- let me have government counsel speak to this, but

1    they won't be a part of the record unless government counsel

2    introduces them in some way.

3              MR. LAING:  Thank you, Your Honor.  Just to make the

4    government's position clear, we were e-mailed drafts of the

5    letters Friday evening, including the e-mail that you referred

6    to from your chambers telling Mr. Brennen, If you want to

7    submit these letters, you should submit them through the

8    government.

9              Our position is the authors of the letters are not

10   victims, certainly not under the CVRA or Rule 32, and don't

11   have any entitlement to be heard at sentencing under those

12   statutes or rules.  So that's why we didn't pass them along,

13   and he made the decision to e-mail them again.

14             THE COURT:  As far as the Court is concerned, they

15   are a non-issue.

16             MR. ROSENTHAL:  Thank you, Your Honor.

17             (Open court:)

18             MR. ROSENTHAL:  Thank you, Your Honor.  We would like

19   to call a number of witnesses.  We are not calling anyone who

20   is going to say that Mr. Victor can leap buildings with a

21   single bound.

22             THE COURT:  Everybody said it in the letters already.

23             MR. ROSENTHAL:  But we want to call people who talk

24   about human, everyday experiences.  And I wanted to introduce

25   the family sitting there in the first row.

1          THE COURT:  Let me have you speak into the microphone

2     so the court reporter --

3          MR. ROSENTHAL:  In the first row is his son, who

4     would like to speak, his daughter, his wife Jo-Ann, his two

5     daughters next to his wife.  In the back row we have Karla and

6     her husband, and we have Sonia Bozic and her husband.

7          And I think we would like to start, Your Honor, if we

8     may, with the defendant's son.

9          THE COURT:  Please.  You may come forward.

10         MR. ROSENTHAL:  Adam, Jr.

11         THE COURT:  Thank you.  You can step right up into

12    the microphone.  And if you would begin by stating your name so

13    that we have it clearly for the record.

14         MR. ADAM VICTOR, JR.:  Thank you, Your Honor.  My

15    name is Adam Victor, Jr.  I live in London and flew in for the

16    day to support my dad, and maybe just give a minute of how

17    important he's been to me and to my family and why.  Everyone

18    in the family is here to support him and -- on this very, very

19    important day, obviously, and very, you know, difficult day.

20         He's been my best friend.  He's been my biggest

21    supporter.  He's been there every step of the way.  What I love

22    about him and my mom is they've raised four very independent

23    children that are all here on their own to attest.  Three of us

24    live away from home we all came here to be with him.

25         I have a number of friends that my dad has been a

1    father figure to over the years, including my best friend who

2    lost his dad suddenly when he was 5.  I think he may have wrote

3    a letter to you guys.  I've had multiple friends who have been

4    caught on the East Coast at the holidays and have nothing but

5    the best things to say about my dad.  You know, he is a very

6    charitable person.  He's been amazing to all of us.

7              It's obviously very wrong, what he's done.  He's

8    accepted it.  He's very conscious of it.  But, you know, he's a

9    good person and I love him very, very dearly, and that's why

10   I'm here today.

11             THE COURT:  Thank you, sir.

12             MR. ADAM VICTOR, JR.:  Thank you.

13             MR. ROSENTHAL:  Jo, do you want to say a word?

14             MS. VICTOR:  Yes.

15             MR. ROSENTHAL:  Okay.  Introduce yourself.

16             MS. VICTOR:  I'm Jo-Ann Bruggemann Victor.  And on

17   May 13th Adam and I will have been together 35 years.  And I

18   remember our first date so very well because we've been

19   together ever since.  And we're married 32 and a half years.

20             My husband is a very good man.  He's been a good

21   husband, and he's been a good father, and he continues to be

22   very good to myself and the children and take very good care of

23   us.  It's been a very difficult year and a half for us.  I know

24   what he did was wrong, but I really hope that you will be

25   lenient today.  Thank you.

1          THE COURT:  Thank you.

2          MR. ROSENTHAL:  Karla?

3          MS. CASTELAR:  My name is Karla Castelar.

4          THE COURT:  Let me have you spell your last name.

5          MS. CASTELAR:  C-a-s-t-e-l-a-r.

6          THE COURT:  Thank you.

7          MS. CASTELAR:  I met Adam through a friend of mine, a

8   fellow colleague, diplomat.  I am from El Salvador and he is

9   from Brazil.  I did my studies in Brazil.  And his name is

10  Francisco.  Francisco was working with Adam in this clean

11  energy project, coal gasification project in Brazil.  And

12  Francisco suggested that I work with him because of my

13  knowledge in six languages.  I have been a diplomat for seven

14  years.

15          So, he suggested that I work with them in this

16  project.  I had already started to try and work in the private

17  sector and I thought it was a great opportunity to rebuild my

18  career and -- to build another type of career; correct me.  And

19  then I worked with Adam as an intern for a whole year and that

20  allowed me to know him as an excellent person, an excellent

21  boss by then.  And we became really good friends and since then

22  he's been helping me out, and my husband as well.

23          He's been helping us out to -- I don't know how to

24  put it.  My husband and I decided to go back to El Salvador

25  after working with Mr. Victor, but then we wanted to -- we

1    decided to stay in the states to try and pursue studies.  So

2    Mr. Victor offered to sponsor us for him to -- for him to study

3    computer engineering.  And then since we applied for a change

4    of status, USCIS came back with a few denials and Mr. Victor

5    was with us the whole way and he never let us down.

6           He's always been with us.  And I -- if I had to put

7    in a word what Mr. Victor is, not only to me, what I've seen,

8    too, he's been to many other people, he's a helpful man, he's

9    always thinking about others ahead of himself.  And I know that

10   he's -- he's a great man, a great friend, great human being.

11   He's made a mistake.  I think he -- he's a really honest person

12   who just made a mistake.

13          THE COURT:  Thank you.

14          MR. ROSENTHAL:  If you'll indulge us with one more?

15          THE COURT:  Sure.

16          MR. ROSENTHAL:  Sonia.

17          MS. BOZIC:  Hello, my name is Sonia Bozic.

18          THE COURT:  Let me have you spell your last name.

19          MS. BOZIC:  B, as in boy, O, Z, zebra, I, C.  Bozic.

20   I am originally from Serbia and I've been in the United States

21   for 11 years.  I came as a student because I'm a filmmaker.  I

22   studied in Serbia filmmaking and then came here to do my

23   master's degree.  I came as one of the best students from my

24   University in Serbia.  Later I moved to New York and then I got

25   accepted to the Ph.D. program at the university.

1          So when I moved to New York it was 2010.  Two years

2     later I met Mr. Victor.  It was kind of an accidental meeting

3     because at the time I worked for -- with a lady who was

4     directing a movie for Mr. Victor.  She and I worked on a

5     different project.  I came to bring the hard drive to her and

6     actually that's the moment I met Mr. Victor.  Since that moment

7     until now we became really great friends.

8          He's been very, very supportive to me, especially

9     because I wrote him a letter about a very traumatic experience

10    I had and the reason why I stopped working for him because --

11         MR. ROSENTHAL:  You don't have to go into it.

12         MS. BOZIC:  It's very hard for me to talk.  The point

13    is, he was very, very supportive.  He and his wife gave me

14    mental support and the family I needed because I don't have my

15    family here.  I was completely alone until my husband came two

16    months ago.  So Adam and Jo are like my American parents here.

17    It's really, really hard to see this whole process because I

18    really love them as my own parents.

19         I worked for Mr. Victor in two different capacities.

20    First time I edit the sound for him, then I started in the film

21    editing.  I was very impressed with the project he was working

22    on, it was about coal gasification into clean energy.  I was

23    really impressed and I wanted to -- I wanted him to have a

24    meeting in Serbia with the Serbian government, and we were able

25    to arrange that.

1            So he went to Serbia with me, met the Minister of

2    Energy and he talked to them.  Unfortunately, my country is

3    very small and, you know, we were not able to actually succeed

4    with this project.  But the whole point was that he was trying

5    to help, and he was always there to recognize the potential and

6    help other countries, not only his own.  And I know how much he

7    loves his own country.

8            So, he's always looking at the greater good, not only

9    his person.  I know he made a mistake, and we all do, but

10   overall he's a very, very genuine, nice man and I hold him in

11   high esteem.

12           THE COURT:  Thank you.

13           MR. ROSENTHAL:  Your Honor, I know that you've read

14   the letters, but I just want --

15           THE COURT:  I'm sorry I don't think you can be heard.

16           There you are.

17           MR. ROSENTHAL:  I know Your Honor has read the

18   letters from others attached to our --

19           THE COURT:  Yes.

20           MR. ROSENTHAL:  But there are a couple of things that

21   stand out.  One, it's someone who is not a friend for the day.

22   He has one friend of some 30 years who fell on hard times.

23   When unemployment insurance ran out, Adam was there for him.

24   When his home became uninhabitable, Adam invited him into his

25   own home.

1          Adam is very active in his building.  There's a woman

2     named Susan who wrote a letter.  I don't know if Your Honor,

3     being from Washington, D.C., understood the terror and horror

4     of being in New York City during Sandy, but I have an apartment

5     and I was there.  And it was truly a scary experience because

6     you've got no electricity.  He lives in a building where he is

7     very active with people.  And the woman writes about how he was

8     there and he sheltered in place, along with a few residents who

9     were left, who couldn't get in a car and simply drive away.

10         He is someone who, when Puerto Rico was hit by a

11    hurricane, he personally organized to try and collect clothing,

12    and collected 50 bags of clothing.  Turned out he couldn't send

13    it to Puerto Rico, but he gave it to a charity in the New York

14    area.

15         But, I understand, getting to know Adam, how he

16    committed this crime.  He is someone who sees something and

17    wants to be part of it and wants to jump on the band wagon and

18    do something good, and that's how he did something that was

19    terribly wrong.  He is someone who did not commit this crime

20    out of greed, he did not commit this crime out of self

21    interest.  He committed this crime because he saw a candidate

22    that he thought was really good and really could be helpful.

23    And in the case of the presidential campaign, he thought that

24    Herman Cain was a fresh face and was going to change things.

25         Your Honor, if we look at the factors that the Court

considers, again, we just want him to be treated similarly to

others who have engaged in conduct which is similar and where

there is no involvement in an official capacity, like being a

treasurer; where there's no obstruction of justice, where

there's no attempt to evade or hide or engage in an elaborate

scheme, where there's no personal benefit, like the defendant

in *Thompson*.  And, importantly, where there isn't any

possibility whatsoever that his conduct could have influenced

the election.

Now, Mr. Laing is quite right, the laws are to be

respected and campaign contribution laws are absolutely

appropriate and to be respected.  But, Your Honor, after the

Supreme Court's decision in public citizen, Mr. Victor could

have easily contributed any amount of money he wanted to a PAC.

And so he didn't have to engage in contributing the money to

these individuals.  It was something that he did.  And I think

Mr. Laing is correct, this is a crime that he's admitted, it

was willful, but it was a foolish crime because he could have

easily done it by submitting the money to a PAC.  And he could

not have possibly influenced the decision of Herman Cain to run

for office or the senator who ran for office.

He couldn't have possibly either convinced them

through these contributions to run or impacted the election

results.  And we have in our brief the amounts that were

contributed by others.  I don't know what -- I don't know even

1        what small fraction it would be, but it's infinitesimally small

2        compared with the size of the contributions.

3               If we look at his history as a caring human being,

4        who has done exceptional service his friends, family,

5        neighbors, and the community and beyond, he is someone who, we

6        respectfully submit, is deserving of probation.  And we really

7        would plead with Your Honor for leniency.

8               THE COURT:  Thank you.  Mr. Victor, do you have

9        something that you would like to say to the Court regarding the

10       sentence to be imposed?  You may come forward.

11              MR. ROSENTHAL:  May I stand with him?

12              THE COURT:  You may.

13              THE DEFENDANT:  Your Honor, I ask that you let me

14       read the statement.  I spent many long hours trying to think

15       long and hard what I was going to say, the last 11 months since

16       I first stood before you.

17              THE COURT:  You're welcome to read it, sir.

18              THE DEFENDANT:  More than six years ago I became

19       enamored with the celebrity that is Washington.  To that end, I

20       purchased four tickets for dinner for my children, and

21       reimbursed three friends for purchasing their tickets to a

22       dinner.  I am embarrassed and ashamed of my actions.  I have

23       never repeated these actions in over six years, and promise

24       this Court I will never do this again.

25              I apologize to my family and to my friends, most

1    notably, my wife of 32 years.  I thank them for their

2    unwavering and continued support.  I apologize to the

3    government, for requiring them to make an extra 11-month effort

4    in this case, and I apologize to Your Honor and to the court.

5    I ask that I may be allowed to return to a life of service to

6    my family, to my community of neighbors, to my country, and to

7    my fellow man.  Thank you very much.

8            THE COURT:  Thank you, sir.  You may have a seat.

9    The Court has calculated the sentencing guidelines, considered

10   statements of counsel, the witnesses, and Mr. Victor.  And it

11   must now consider the relevant factors set forth by Congress in

12   18 U.S.C. 3553(a) in order to ensure that it imposes a sentence

13   sufficient but not greater than necessary to comply with the

14   purposes of sentencing.  These purposes include the need for

15   the sentence imposed to reflect the seriousness of the offense,

16   to promote respect for the law, and to provide just punishment

17   for the offense.  The sentence should also deter criminal

18   conduct, protect the public from future crimes by a defendant,

19   and promote rehabilitation.

20           In addition to the guidelines and policy statements,

21   the Court must consider the nature and circumstances of the

22   offense, the history and characteristics of the defendant, the

23   types of sentences available, the need to avoid unwarranted

24   sentence disparities among defendants with similar records who

25   have been found guilty of similar conduct, and the need to

1     provide restitution to any victims of the offense when

2     applicable.

3              I have considered all of these factors when deciding

4     what the appropriate sentence is in this case.  And in

5     accordance with my ordinary practice, I won't detail my

6     considerations with respect to each factor orally here today.

7              But I do want to say a few things for the record and

8     for you, Mr. Victor, about the nature of this offense, about

9     your history and characteristics, as reflected in the many

10    letters of support and statements that were made here today,

11    and the types of sentences that are available under the

12    circumstances presented in this case.

13             First of all, let me say that there is no question

14    that a scheme to make illegal campaign contributions in

15    violation of federal law is a serious offense.  You have

16    admitted to knowingly and willfully making what the government

17    calls conduit campaign contributions.  Specifically, in the

18    year 2011 it appears that you gave thousands of dollars to two

19    candidates for public office in the names of third parties in

20    order to flout federal election law, restrictions on individual

21    campaign contributions.

22             Now, I've heard it described in this sentencing

23    hearing today in several ways, most notably from the defense as

24    the purchase of tickets for dinner.  And to be sure, spun that

25    way sounds very innocuous, but it was a circumstance in which

1   federal election law was violated.  The other circumstances

2   that were referenced in the plea agreement indicate that it is

3   not an isolated incident, nor was it insubstantial, at least

4   the aspect of this that required other people to lend their

5   names to these purported contributions that you would then

6   reimburse.

7          And even more important, it was intentional.  As far

8   as the Court can tell, as indicated by the papers and the

9   record in this matter, there was a deliberate effort to disobey

10   the law.  Now, Mr. Laing says inherent in this effort is

11   deceit, that when you have these conduit campaign

12   contributions, there are payments that are structured precisely

13   to avoid detection.

14          So I wanted to be clear that that is not only a

15   violation of the law, but it is wrong.  It is intentional.  And

16   it is not, you know, a mistake in the way that I have heard it

17   to be described here this afternoon.

18          And I will say again, it also appears to not have

19   been the first time that you have acted to skirt federal

20   campaign laws.  There's uncharged conduct of a similar nature

21   that this Court has taken into account in the context of its

22   3553(a) deliberations.

23          I suppose, if there is any good news for you coming

24   out of all of this, it is the fact that the Court is required

25   to look at a variety of factors beyond just the nature of the

offense.  As I mentioned, I've also had to consider such other

things as your history and characteristics, and the types of

sentences available and the need to avoid unwarranted

sentencing disparities.

Let me say, with respect to sentencing disparities,

that my usual practice involves looking at relevant statistics

regarding how other defendants who have engaged in similar

conduct have been sentenced.  Mr. Rosenthal has pointed out

certain various other cases, looking at the facts, trying to

identify similarities and parse what occurred in those

different cases.  But typically I turn to statistics and I

generally ask the Sentencing Commission to afford the

statistics for me.  But I didn't do so in this case and it was

because publicly available information indicated that there

really are too few cases that are sentenced under this

guideline to provide a meaningful touchstone, from the Court's

perspective.

For example, according to the Sentencing Commission's

publicly available records, in 2016 there were only four cases

sentenced under this guideline.  Now, I know Mr. Rosenthal

pointed out some FEC cases, certain other cases that involved

different kinds of crimes, and perhaps may have even been

sentenced under different guidelines, but the true apples to

apples comparison is done by looking at defendants who are

sentenced under the same guideline.  And from this Court's

1   perspective, there are too few cases really to be meaningful in

2   terms of providing a comparison.  Which also leads one to

3   conclude that the fact that you've been prosecuted for this

4   crime and are now being sentenced for it makes you somewhat

5   unusual.

6          You are also unusual when the Court looks at your

7   characteristics, as someone who has been convicted of a federal

8   criminal offense.  You have no criminal history and you have a

9   truly impressive background of generous contributions to those

10  in need, especially after major disasters in your hometown and

11  elsewhere.  We have heard from people here today, your family

12  members and your friends -- and let me pause to thank you all

13  for being here -- we've heard about your character.

14         I've reviewed the many letters that attest to your

15  kindness and your generosity and I have no reason to doubt the

16  sincerity of the many people who see you as a wonderful father,

17  a trustworthy confidant, and a friend.  Let me say, you are

18  unusual because you are lucky to have such a deep well of

19  support from family and people in your community, and I have

20  taken that into account.

21         But I also need to say that this Court, perhaps

22  unlike some others, is rarely moved to change my view of the

23  appropriate sentence as a result of a defendant's status or

24  prior good works.  Indeed, I often think that defendants who

25  are in a position to do good things for others because of their

1    status or financial ability, were also in a position to do the

2    right thing when it comes to criminal behavior and yet, for

3    whatever reason, opted not to.

4         In other words, I see a lot of criminal defendants

5    who have had very hard lives and difficult circumstances and

6    sometimes turn to crime because they really don't have much of

7    a choice, all things considered.  But the defendants who have

8    degrees in businesses and reputations also had every

9    opportunity to act in accordance with the law, and some would

10   say should have known better than to engage in criminal

11   conduct.

12        Therefore, although I know your counsel was following

13   what many courts require and consider in terms of all of the

14   laudable and notable achievements, I typically reject the

15   suggestion that the loss of status or the stain on a

16   defendant's reputation is sufficient punishment for completely

17   volitional decisions to break the law.  And I'm rarely

18   persuaded to give such defendants what I believe to be an

19   unwarranted break at sentencing due to such accomplishments.

20        I think what has most influenced me with respect to

21   today's sentencing is the types of sentences available to

22   defendants who have been convicted of the crime that you have

23   pled guilty to under the circumstances presented here.  As I

24   noted, when I reviewed the penalty structure, imprisonment is

25   authorized for your crime and, under the guidelines, the

1          recommended range of imprisonment is 6 to 12 months.

2                  But the statute that applies to your crime of

3          conviction also authorizes at least one year of probation.  And

4          because your guideline range falls within zone B of the

5          sentencing table, the guidelines permit the minimum term of

6          imprisonment to be replaced with, quote, a sentence of

7          probation that includes a condition or combination of

8          conditions that substitute intermittent confinement, community

9          confinement, or home detention for imprisonment.  And I'm

10         reading from guideline 5C1.1.

11                 In other words, under the applicable criminal statute

12         and consistent with the guidelines, this Court can impose a

13         term of probation that includes a period of home confinement.

14         And I do believe that such a sentence is sufficient but not

15         greater than necessary to reflect the seriousness of the

16         instant offense, to promote deterrence, and to avoid

17         unwarranted disparities among defendants convicted of similar

18         crimes.

19                 I want to note and to emphasize that the sentence the

20         Court imposes today is not a variance.  I am not persuaded to

21         vary downward based on any lack of information in the record

22         about a potential quid pro quo, which I think is an unknown

23         that is not necessarily dispositive of the seriousness of this

24         crime, nor am I moved to depart from the guidelines or vary

25         downward based on the abundance of information in the record

1    regarding Mr. Victor's prior good works, as I mentioned

2    earlier.

3              What I am doing by substituting a term of

4    imprisonment for a term of probation with home confinement is

5    entirely consistent with what the federal statutes require in

6    terms of the imposition of probation for certain felony

7    convictions and what the guidelines authorize for sentencing

8    ranges that fall into zone B of the sentencing table.

9              Therefore, based on my consideration of all of the

10   3553(a) factors, I will now state the sentence to be imposed.

11   Mr. Victor, please stand.  It is the judgment of this Court

12   that you, Adam Victor, are hereby sentenced to serve a 12-month

13   term of probation, to include a period of six months of home

14   confinement, on Count 1.

15             You are further sentenced to pay a $100 special

16   assessment.  The Court finds that you do have the ability to

17   pay a fine and, therefore, imposes the statutory minimum fine

18   amount of $52,500.  The special assessment and restitution are

19   immediately payable to the Clerk of the Court for the U.S.

20   District Court for the District of Columbia.  Within 30 days of

21   any change of address you shall notify the Clerk of the Court

22   of the change until such time as the financial obligation is

23   paid in full.  The Court waives any interest or penlites that

24   may accrue on unpaid balances.

25             Within 72 hours of release from custody -- excuse me.

1    You're not being incarcerated, so that is a mistake.

2          As soon as you leave here, you need to report to the

3    probation office in the district to which you are released,

4    which is here.  You shall follow all of the general conditions

5    of probation that have been adopted by the U.S. probation

6    office, as well as the following special conditions, which I

7    will state and then describe the reasons for, as the D.C.

8    Circuit requires:

9          You shall serve a period of home confinement for the

10   first six months of the probationary period.  And during this

11   time you will be subject to the following restrictions on your

12   movement in the community:  You are restricted to your

13   residence at all times except for employment, education,

14   religious services, medical, substance abuse, or mental health

15   treatment, attorney visits, court appearances, Court-ordered

16   obligations, or any other activities as pre-approved by the

17   probation office.

18         To enforce this condition you shall be subject to

19   location monitoring.  Specifically, you shall be monitored by

20   radio frequency monitoring and shall abide by all technological

21   requirements, rules and regulations of the location monitoring

22   program.  You shall bear the costs of participation in the

23   location monitoring program.  Imposing this condition is

24   reasonably necessary to reflect the seriousness of the offense

25   and to provide just punishment for this offense.

1          The fine that the Court has imposed is due in

2    accordance with the following payment schedule:  A lump sum

3    payment of $2,000 is due immediately, with the balance to be

4    paid not later than April 15th, 2018.

5          You must also provide the probation officer access to

6    any requested financial information and authorize the release

7    of any financial information until the fine obligation that

8    this Court has imposed is satisfied.

9          The probation office may share your financial

10   information with the United States Attorney's Office.  Like the

11   fine itself, this condition is the least restrictive means of

12   ensuring that the financial obligation that the Court has

13   imposed as part of your sentence is satisfied.

14         The Court finds that the standard provision for

15   submission to periodic drug tests, if it is required, is

16   suspended, as you are believed to pose a low risk of future

17   substance abuse.

18         Probation office shall release the presentence

19   investigation report to all appropriate agencies in order to

20   execute the sentence of the Court.  Any treatment agencies

21   shall return the presentence report to the probation office

22   upon the completion or termination of probation.

23         Mr. Victor, you have the right to appeal the sentence

24   imposed by this Court under the limited circumstances laid out

25   in your plea agreement.  If you choose to appeal, you must file

1    an appeal within 14 days after the Court enters judgment.  If

2    you are unable to afford the cost of an appeal, you may request

3    permission from the Court to file an appeal without cost to

4    you.

5          At this time, from the parties, are there any

6    objections to the sentence imposed that are not already noted

7    on the record?

8          MR. LAING:  None from the government, Your Honor.

9          MR. ROSENTHAL:  Your Honor, just a point -- just a

10   question.

11         THE COURT:  Let me have you come forward.

12         MR. ROSENTHAL:  On electronic monitoring, I don't

13   know whether Your Honor intended an ankle bracelet or some

14   other form acceptable to probation.  He does have a problem

15   with his ankles that would severely pose a problem if he had --

16         THE COURT:  All right.  Let's have you work it out

17   with probation.  If you need to ask for a modification of the

18   probation conditions in light of that, you can talk with them

19   and file such a motion.

20         MR. ROSENTHAL:  Okay.  And one other question.  Would

21   it be permitted to go within his building?  He acts almost like

22   a superintendent, doing things for folks in the building.

23   Would that be within the home confinement, to do things solely

24   for the purpose of assisting people in the building?

25         THE COURT:  Let me ask probation whether the standard

1    conditions -- so let me just be clear.  The conditions of

2    probation are generally monitored and supervised by the

3    probation office.  So I'm trying to determine, from your

4    perspective, whether in an apartment building, the movement

5    within the building counts?

6              THE PROBATION OFFICER:  Okay.  So, that brought to

7    mind one other thing that I just wanted to remind the Court.

8    That Mr. Victor does live in New York and so we would be

9    transferring supervision to the District of -- the Southern

10   District of New York.

11             THE COURT:  Yes.

12             THE PROBATION OFFICER:  So because I'm not familiar

13   with majorly large apartment buildings -- which I believe it's

14   a little bit larger than the normal apartment building here in

15   the District -- I know that we're able to manage to monitor

16   people within a unit, a multiunit building, and so I would

17   imagine that the District of New York has that capability and

18   would be able to set the monitoring frequency to allow for him

19   to move about the building, without having to go outside the

20   building.

21             THE COURT:  All right.  Let me make it clear for the

22   record that the Court's intention is that he be allowed to do

23   so.  And so, therefore, to the extent that you need to

24   communicate with New York or whatever and let them know that

25   that is my intention.

1          THE PROBATION OFFICER:  Yes.  Certainly, Your Honor.

2     Thank you.

3          MR. ROSENTHAL:  And only one other question.  You

4     said doctors visits.  I know he goes to a physical therapist

5     and I assume --

6          THE COURT:  That is covered by the exceptions.  And,

7     of course, in this context he's just needing to be in

8     communication with the probation department to let them know

9     where he's going, under what circumstances.  And physical

10    therapy is covered by my medical condition.

11         MR. ROSENTHAL:  Thank you very much, Your Honor.

12         THE COURT:  All right.  Anything else that needs to

13    be addressed at this time?  Not from the government?

14         MR. LAING:  Not from the government.

15         MR. ROSENTHAL:  Not from the defense.

16         THE COURT:  All right.  Let me say, Mr. Victor, your

17    sentence of probation begins today.  You must report to the

18    probation office immediately after this hearing concludes.

19         Furthermore, let me caution you about your conduct

20    while you are on probation.  You are required to follow the

21    conditions of the probation office, both the ones that I have

22    specifically discussed here today and those that the probation

23    office would direct.  If you violate any of those conditions,

24    your probationary term may be revoked after a hearing on the

25    matter and you may be resentenced to a term of imprisonment.

1    And if you are found to possess a controlled substance or a

2    firearm, such revocation is mandatory.  Is that understood?

3              THE DEFENDANT:  It's understood, Your Honor.

4              THE COURT:  All right.  Is there anything else we

5    need to address here today from either side?

6              MR. LAING:  Not from the government, Your Honor.

7              MR. ROSENTHAL:  No, Your Honor.

8              THE COURT:  Thank you Mr. Victor.  Good luck.

9              MR. ROSENTHAL:  Thank you.

10                            *   *   *

```
 1
 2                  CERTIFICATE OF OFFICIAL COURT REPORTER
 3
 4
 5          I, JANICE DICKMAN, do hereby certify that the above
 6    and foregoing constitutes a true and accurate transcript of my
 7    stenograph notes and is a full, true and complete transcript of
 8    the proceedings to the best of my ability.
 9                     Dated this 15th day of March, 2018.
10
11
12                     /s/_____
13                     Janice E. Dickman, CRR, RMR
                       Official Court Reporter
14                     Room 6523
                       333 Constitution Avenue NW
15                     Washington, D.C. 20001
16
17
18
19
20
21
22
23
24
25
```